UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ANTHONY ECHEVARRIA, individually and on behalf of all others similarly situated,

                        Plaintiff,

     v.

GAMESTOP, INC.,

                        Defendant.

------------------------------------------------------------x

Case No. 1:22-cv-02143

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Anthony Echevarria ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

      1.     This is a class action suit brought on behalf of all persons with Facebook accounts who purchased video games through gamestop.com.

      2.     Gamestop, Inc., ("Defendant") is "the world's biggest game retailer."[1] Defendant sells video games through its website, gamestop.com ("Gamestop"). To solicit additional purchases, Defendant knowingly collects and discloses its purchasers' personally identifiable information—including a record of every video game they purchase—to Facebook without consent.

      3.     The United States Congress passed the Video Privacy Protection Act ("VPPA") in

---

[1] Ben Gilbert, *The world's biggest video game retailer, GameStop, is dying: Here's what led to the retail giant's slow demise*, BUS. INSIDER (Jan. 23, 2020), https://www.businessinsider.com/gamestop-worlds-biggest-video-game-retailer-decline-explained-2019-7.

1

1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

4. Defendant violated the VPPA by knowingly transmitting Plaintiff's and the putative class's personally identifiable information to unrelated third parties.

## FACTUAL BACKGROUND

### I. The VPPA

5. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

6. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any

person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II. The Facebook Tracking Pixel

7. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2] Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

8. Facebook generates revenue by selling advertising space on its website.[6]

9. Facebook sells advertising space by highlighting its ability to target users.[7] Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[5] FACEBOOK, SIGN UP, https://www.facebook.com/
[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

10.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14] One such Business Tool is the Facebook Tracking Pixel.

11.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[15]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

12.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a

---

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

visitor views.[16]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

13. Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the Pixel ID and cookie."[21]

### III. Gamestop And The Facebook Pixel

14. Defendant's website advertises and sells thousands of video games.

15. Gamestop also hosts the Facebook Tracking Pixel which tracks customers throughout the purchase process.

16. When a user searches for a video game, for example, Gamestop discloses event data labelled PageView and Microdata.

---

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[20] *Id.*
[21] *Id.*

**Figure 1**



17.     PageView and Microdata data discloses what video games a user has searched.

**Figures 2 & 3**



18.     When a consumer clicks on the searched game, along with PageView and MicroData, Gamestop also discloses ViewContent, an event that explicitly lists the video game's title.

6

**Figure 4**



**Figures 5-7**



19.     When consumers add the video game to their cart, Gamestop discloses PageView, ViewContent and Microdata, along with two additional events, ButtonClick and AddToCart.

**Figure 8**



**Figures 9-10**



20.     When checking out, Gamestop discloses PageView, Microdata, and Button Click events.

**Figure 11**



8

**Figures 12-14**



21. To checkout, a user must click the button "Place Order."

**Figure 15**



9

When a user clicks "Place Order," Gamestop discloses that event to Facebook.

22. The event data disclosed by Gamestop permits an ordinary person to identify a purchased video game.

23. When a consumer purchases a video game while logged into Facebook, Gamestop compels a visitor's browser to transmit to Facebook the c_user cookie, which contains that visitor's unencrypted Facebook ID. When purchasing the above game, for example, Defendant compelled the browser to send eight cookies, seven of which are visible here:

**Figure 16**

| presence | C%7B%22t3%22%3... | .facebook.com |
| xs | 41%3AE51w5wpm1... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| sb | qqAzYsNOnTC8nEy... | .facebook.com |
| fr | 0rbLeQ9FE49K0mD... | .facebook.com |
| wd | 1292x959 | .facebook.com |
| c_user | 100035966074568 | .facebook.com |

24. When a visitor's browser has recently logged out of Facebook, Defendant will compel the browser to send a smaller set of cookies:

**Figure 17**

| fr | 0W3d3FkEC2jPGTiY... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| sb | qqAzYsNOnTC8nEy... | .facebook.com |
| locale | en_US | .facebook.com |
| wd | 1738x959 | .facebook.com |
| _fbp | fb.1.1647801156227... | .gamestop.com |

25. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[22] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a

---

[22] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

browser.[23] The datr cookies also identifies a browser. [24] Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[25]

26. If a visitor has never created a Facebook account, two cookies are transmitted:

**Figure 18**

| _fbp | fb.1.16497… | .gamestop.com |
| fr | 0Em9HNk… | .facebook.com |

27. Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. Facebook uses both for targeted advertising.

28. The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[26] If that happens, the time resets, and another 90 days begins to accrue.[27]

29. The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[28] If that happens, the time resets, and another 90 days begins to accrue.[29]

30. The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, Gamestop.[30] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[31] The _fbp cookie is always transmitted as a first-party cookie. A

---

[23] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.
[24] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] Confirmable through developer tools.
[28] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[29] Also confirmable through developer tools.
[30] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[31] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

11

duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

31. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

32. A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

33. Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what video game a user has purchased.[32]

34. By compelling a visitor's browser to disclose the c_user cookie alongside event data for video games, Gamestop knowingly discloses information sufficiently permitting an ordinary person to identify what video games a specific individual has purchased.

35. By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for video games, Gamestop knowingly discloses information sufficiently permitting an ordinary person to identify what video games a specific individual has purchased.

36. By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for video games, Gamestop knowingly discloses information sufficiently permitting an ordinary person to identify what video games a specific individual has purchased.

37. Facebook confirms that it matches activity from Gamestop with a user's profile. Facebook allows users to download their "off-site activity," which is a "summary of activity that

---

[32] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

12

businesses and organizations share with us about your interactions, such as visiting their apps or websites."[33] Here, the off-site activity report confirms Facebook has received information identifying what video games a consumer has purchased

**Figure 19**

| | |
|---|---|
| **Activity received from gamestop.com** | |
| ID | 178170037741173 |
| Event | PAGE_VIEW |
| Received on | January 9, 2022 at 1:26 PM |
| ID | 178170037741173 |
| Event | PAGE_VIEW |
| Received on | January 3, 2022 at 3:22 PM |
| ID | 321931382066160 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 2347808105484326 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 711136938980652 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 2485086754916316 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 321931382066160 |
| Event | PURCHASE |
| Received on | February 9, 2021 at 12:08 PM |

---

[33] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627. As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity." What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

13

### IV. Experience of Plaintiff Anthony Echevarria

38. In 2012, Plaintiff Echevarria created a Facebook account.

39. Plaintiff Echevarria has purchased numerous video games from Gamestop, including UFC 2, which contains video cut scenes such as the following:

**Figure 20**



40. Plaintiff Echevarria has completed these purchases by checking out as a guest.

41. Unbeknownst to Plaintiff Echevarria, each time he purchased a game, Defendant transmitted his personally identifiable information to Facebook. This information specifically identified Plaintiff Echevarria and what video games he purchased.

42. Plaintiff Echevarria discovered that Gamestop surreptitiously collected and transmitted his personally identifiable information in April 2022.

## PARTIES

43. Plaintiff Echevarria is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York.

44. Defendant Gamestop, Inc. is a Minnesota corporation with its principal place of

business at 625 Westport Parkway, Grapevine, Texas 76051. Defendant develops, owns, and operates gamestop.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

46. This Court has personal jurisdiction over Defendant because Defendant disclosed Plaintiff Echevarria's personally identifiable information in this District.

47. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

48. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have purchased a video game from Gamestop.

49. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

50. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

51. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions

that may affect individual members of the Class include:

      (a) whether Defendant collected Plaintiff's and the Class's PII;

      (b) whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

      (c) whether Defendant's disclosures were committed knowingly; and

      (d) whether Defendant disclosed Plaintiff's and the Class's PII without consent.

52. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased video games from Gamestop and had his PII collected and disclosed by Defendant.

53. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

54. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of

the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

55. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

56. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

57. Defendant is a "video tape service provider" because it offers thousands of video games for sale on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

58. Plaintiff and members of the Class are "consumers" because they purchased video games. 18 U.S.C. § 2710(a)(1).

59. Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information. Defendant utilized the Facebook Tracking Pixel

17

to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like his Facebook ID, along with Plaintiff's event data, like the title of the video games he purchased.

60. Plaintiff and the Class members purchased video games from Defendant.

61. Defendant knowingly disclosed Plaintiff's and the Class members' personally identifiable information because it used that data to build audiences on Facebook to retarget them for its advertising campaigns.

62. Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

63. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

64. On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: April 13, 2022

Respectfully submitted,

By: */s/ Joshua D. Arisohn*
Joshua D. Arisohn

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
           pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly (*Pro Hac Vice forthcoming*)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail: creilly@bursor.com

*Attorneys for Plaintiff and the Putative Class*